UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Donna Sheard, Richard Allen, and Gabrielle Todd, each individually and on behalf of all others similarly situated, | Court File No.: 3:23-cv-4012 |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| Home Partners Holdings LLC, OPVHHJV LLC, d/b/a Pathlight Property Management, and HPA US1 LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Donna Sheard, Richard Allen and Gabrielle Todd, each individually and on behalf of all others similarly situated, bring this action against Home Partners Holdings LLC, OPVHHJV LLC, d/b/a Pathlight Property Management, and HPA US1 LLC (collectively "Defendants"), and allege as follows:

### INTRODUCTION

1.     Defendants are corporate landlords who collectively own, lease, and manage approximately 17,000 homes in over 80 markets across the United States. Home Partners began in Chicago, Illinois, and was formerly known as Hyperion Homes.

2.     Defendants operate as alter egos of each other and market themselves as a joint entity. Pathlight states on its website that both Pathlight and Home

Partners "are proud to offer" lease programs to prospective tenants.[1] Pathlight's website contains a Home Partners logo, demonstrating their interlocking relationship.

3.    Defendants operate two rental programs: a "right-to-purchase" (RTP) program, which is the primary means through which they acquire single family residences, and a "non-right-to-purchase" rental program, through which they rent out homes they have already purchased (NRTP).

4.    Whether a prospective tenant chooses the RTP or NRTP program, Defendants represent for every home that is available for lease, that the home is "[p]rofessionally managed by Pathlight Property Management, the exclusive property manager for Home Partners of America, offering excellent customer service, 24/7 emergency maintenance service, online application and payments, and pet-friendly options."[2]

5.    Despite these promises, Defendants routinely require tenants to enter contracts of adhesion that purport to waive and modify the warranty of habitability through several different lease provisions found throughout Defendants' uniform contracts.

6.    In addition, Defendants, through form contracts of adhesion, require tenants to agree to take on maintenance and repair obligations that otherwise would be borne by Defendants. In their leases, Defendants falsely state that the tenants'

---

[1] https://www.pathlightmgt.com/ (last visited December 4, 2023).

[2] https://www.pathlightmgt.com/search (last visited December 4, 2023).

rental rates were negotiated and would otherwise be higher but for the tenants' alleged agreement to maintain and repair.

7.    In reality, Defendants unilaterally set rental rates, without assigning any consideration for the tenants' alleged agreement or the value of their services.

8.    During and at the end of tenancies, and using the same form leases, Defendants routinely pursue their tenants for payment of normal wear and tear damage, or pre-existing or other damage to Defendants' real property, which was not caused by the tenants at all. This conduct also violates the warranty of habitability and statutory consumer protection laws.

9.    Finally, under the leases, Defendants assess tenants with numerous lease administration and property management fees, including but not limited to a "pay-to-pay" utility fee, an HVAC filter fee, late fees, and for the cost of insuring Defendants' property.

10.    The reason for Defendants' use of their misleading form leases is simple: Sophisticated corporate landlords intentionally include unenforceable or misleading clauses in their leases "trusting they could profit from inserting such terms. [These clauses] are likely to mislead tenants into believing that they reflect the legal state-of-affairs."[3]

---

[3] Meirav Furth-Matzkin, *Unenforceable and Misleading Clauses in Consumer Contracts: Evidence from the Residential Real Estate Market*, June 2015, John M. Olin Center for Law, Economics, and Business Fellows, *available at* http://law.harvard.edu/programs/olin_center/; *see also* Furth-Matzkin, *On the Unexpected Use of Unenforceable Contract Terms: Evidence from the Residential Real Estate Market*, 9 Journal of Legal Analysis 1 (2017).

11.    In addition to seeking damages, this action seeks to enjoin Defendants from continuing to use their misleading or unenforceable leases and a return of the monies paid to Defendants through their illegal leases.

## PARTIES

12.    Donna Sheard is an adult residing in Edwardsville, Illinois and is a citizen of Illinois.

13.    Richard Allen is an adult residing in Edwardsville, Illinois and is a citizen of Illinois.

14.    Gabrielle Todd is an adult residing in Plainfield, Illinois and is a citizen of Illinois.

15.    Defendant Home Partners Holdings LLC ("Home Partners") is incorporated in Delaware with its principal place of business in Chicago, Illinois.

16.    Defendant OPVHHJV LLC, d/b/a Pathlight Property Management ("Pathlight") is a subsidiary, agent, and alter ego of Home Partners of America. Pathlight is incorporated in Texas with its principal place of business in Texas. Pathlight is wholly owned by Home Partners.

17.    Upon information and belief, Defendant Home Partners or one of its subsidiaries operates and purchases homes through separately incorporated limited liability companies ("LLCs"), but Defendant Home Partners (or one of its officers or employees) is a member of those LLCs.

18.    Defendant HPA US1 LLC, an LLC incorporated in the State of Delaware with its principal place of business in Chicago, Illinois, is also one of these LLCs. Plaintiffs' leases each state they entered into an agreement with this entity.

19.    HPA US1 LLC and these other LLCs were, at all relevant times, the agents, servants, employees, alter-egos or joint venture of Defendant Home Partners, and acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture, and with the permission and consent of each of the other Defendants.

## JURISDICTION AND VENUE

20.    This Court has original subject matter jurisdiction over this controversy pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because Plaintiffs and members of the Class are citizens of states different than Defendants' home states, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs.

21.    This Court has personal jurisdiction over Home Partners Holdings LLC because it has conducted substantial business in this District and intentionally and purposefully markets, promotes, and places its homes into the stream of commerce in this District and throughout the United States.

22.    This Court has personal jurisdiction over HPA US1 LLC because it is registered to do business in this District and intentionally and purposefully markets, promotes, and purchases homes in this District and throughout the United States.

23.    This Court has personal jurisdiction over OPVHHJV LLC, d/b/a Pathlight Property Management, because it serves as the property manager for all of Defendants' rental properties in this District.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred

in this District. Defendants marketed, advertised, leased and sold the affected homes, as well as conducted extensive business, within this District.

## FACTUAL ALLEGATIONS

### I.    Defendants' Scheme

25.    Home Partners' website states, "[f]rom the beginning, Home Partners and Pathlight communicate with residents throughout the entire process. Once the house has closed and the Make-Ready renovations have been completed, Pathlight will send a Welcome Email to residents that outlines the move-in process and answers questions that may arise during the lease term."[4]

26.    Defendant Home Partners is now a subsidiary of Blackstone Inc., a New York City-based investment firm.[5]

27.    In a $6-billion-dollar deal, Blackstone purchased Defendant Home Partners through an investment fund called Blackstone Real Estate Income Trust.

28.    Blackstone is one of many large firms to capitalize off the 2010 foreclosure crisis precipitated by the Great Recession.

29.    In the wake of the 2007 housing market crash, as thousands of American families lost their homes, the federal government launched a pilot program that allowed Blackstone and other private investors, some of whom facilitated the

---

[4] https://www.homepartners.com/faqs/Move-In-Pathlight/Pathlight-Property-Management-/When-does-Pathlight-become-the-main-point-of-contact-for-incoming-residents (last visited December 4, 2023).

[5] https://www.wsj.com/articles/blackstone-bets-6-billion-on-buying-and-renting-homes-11624359600 (last visited December 4, 2023).

financial crisis in the first place, to purchase swaths of foreclosed homes from Fannie Mae.

30.    Large private equity groups, hedge funds and other large investors spent a combined $36 billion on more than 200,000 homes between 2011 and 2017.

31.    In effect, these large entities are building a new corporate landlord-tenant scheme across the country.[6]

32.    While large corporate entities have been involved in the housing market since before the 2010 foreclosure crisis, their involvement only continues to grow. These corporate landlords claim their buying efforts will stabilize the country's most dilapidated housing markets. They claim they will be even better landlords than traditional, local landlords by using their capital to maintain the homes, and they claim to make home rentals easy and affordable.

33.    However, over time, these corporations have displaced individual home buyers (or individual landlords and property owners) not only in housing markets decimated by foreclosure, but also in healthy urban, suburban and exurban residential real estate markets.

34.    Against this background, Home Partners (then operating as Hyperion) entered the residential real estate market in 2012 as a real estate investment and property management group, and claimed that by purchasing homes on behalf of residents in markets nationwide, they would help thousands of home-seekers live in

---

[6] https://www.theatlantic.com/technology/archive/2019/02/single-family-landlords-wall-street/582394/ (last visited December 4, 2023).

a home they otherwise were not yet ready to purchase, under terms that best fit their needs.

35.    Defendants state they rent single-family homes to persons in three primary demographics: (1) recent transferees to an unfamiliar or new city or suburb; (2) persons desiring to live in a single-family home, but who lack the creditworthiness to obtain a mortgage; and (3) persons who want to rent a single-family home but who are "uncertain" about home ownership.

36.    Defendants target these demographics through marketing to real estate agents and online and print advertisements that promote the availability of homes.

37.    Defendants market extensively through their own websites as well as local real estate agencies.[7]

38.    Defendants operate two rental programs: a "right-to-purchase" (RTP) program, which is the primary means through which they acquire single family residences, and a "non-right-to-purchase" rental program, through which they rent out homes they have already purchased (NRTP).

39.    The RTP rentals are long-term, up to five years. Each RTP lease contains an automatic renewal provision. The NRTP rental contracts are for one-year terms.

40.    In the context of the RTP program, Defendants represent prospective customers, working with their real estate agents, can pick a home being offered for

---

[7]https://www.pathlightmgt.com/search?sort=&search_text=&rent=&state=IL&city=&available_date=&beds=&bathrooms= (last visited December 4, 2023).

sale, and that Defendants will buy the home for the prospective customer to rent from Defendants, for up to five years. To induce prospective customers to go through Home Partners and the RTP program, Home Partners claims they "buy it and lease it to you with the peace of mind of locked-in rent amounts and purchase prices. Live in the home as a renter with the option to buy it at any point. At the end of your 1-year lease term, you can renew for another year or walk away with no penalties. No matter what you decide, we are your partner. [...] On average, move-in will be 2 weeks after closing to accommodate any necessary repairs found during our home inspection. [...] Your agent facilitates the inspection and will make sure all utilities are on."[8]

41.    Defendants together claim that they expend significant effort and resources to purchase a particular home on the prospective tenant's behalf.

42.    Whether a prospective tenant chooses the RTP or NRTP program, Defendants represent for every home that is available for lease, that the home is "[p]rofessionally managed by Pathlight Property Management, the exclusive property manager for Home Partners of America, offering excellent customer service, 24/7 emergency maintenance service, online application and payments, and pet-friendly options."[9]

43.    Defendants also represent that their houses are "qualified," "move-in ready" and have passed inspection. Defendants do not share the results of any

---

[8] https://www.homepartners.com/how-it-works  (last visited December 4, 2023).

[9] https://www.pathlightmgt.com/search (last visited December 4, 2023).

inspection reports with their tenants, and thus tenants are unaware of what repairs, if any, were declined or undertaken.

44.    Before an RTP tenant signs a lease, Defendants send to tenants an "Anticipated Terms" document that makes representations regarding the terms of the lease and states that tenants are responsible for utilities, such as water, trash, and sewer, lawn and landscape maintenance, snow/ice removal, and "other day-to-day maintenance." The "Anticipated Terms" document also states Defendants expect tenants to maintain the home as if it were the tenants' own, and that tenants are required to maintain their own general liability renters' insurance. The terms do not disclose that tenants may later be force-placed into Defendants' own insurance if they do not obtain their own renters' insurance.

45.    Defendants' Anticipated Terms, leases and other pre-lease materials are drafted by Home Partners in Chicago, Illinois. Tenants communicate with and receive lease documents for signature from Home Partners' leasing, acquisitions, closings and applications teams, which are also based in Chicago. Tenants receive these pre-lease documents and the leases themselves from Home Partners' leasing and acquisitions teams, and Home Partners' leasing team facilitates tenants' wiring of their initial security deposit.

46.    Defendants claim to "take the responsibility of managing your home's safety and maintenance seriously. Our team is always ready to handle large service

requests, but we kindly ask that residents take care of smaller maintenance issues themselves."[10]

47.    But prospective customers are not provided a complete list of the obligations and "service requests" and "maintenance issues" that they will be required to take on as tenants, which include but are not limited to managing pest infestations, lawn care, snow removal, and repairing appliances.

48.    Nor do Defendants fully disclose the additional fees tenants will be required to pay under the lease, including for the cost of insuring Defendants' property, paying for HVAC upkeep through an HVAC filter fee charge, and paying for other lease administration expenses connected to utility billing or Defendants' attempts to evict tenants, even when they are not prevailing parties in an action.

49.    For each house, Defendants set a monthly base rent for each year in which a tenant occupies a house.

50.    Defendants state and admit they do not negotiate these amounts with tenants.[11]

51.    Nonetheless, in contradiction of the foregoing statements, which are provided to the general public and tenants before they sign any lease, Home Partners represents in its form adhesion leases that "[t]he amount of Rent was agreed upon

---

[10] https://app.pathlightmgt.com/help/detail/General-Maintenance/6157473947931/What-are-resident-and-Pathlight-maintenance-responsibilities (last visited December 4, 2023).

[11] https://app.pathlightmgt.com/help/detail/Lease-Information/360043853871/Is-rent-negotiable (last visited December 4, 2023).

based on the express understanding that Tenant will be responsible for the maintenance needs of the Premises as provided in this Lease and in the absence of Tenant's agreement to maintain the Premises at its cost in accordance with the terms of this Lease, Landlord would have charged a higher rent amount."

52.    Home Partners does not apply or credit any amount paid in rent or on maintenance or repairs during the lease term to reduce the rent.

53.    Home Partners does not credit the value of the services tenants provide to maintain Defendants' properties toward the rent, nor represent to tenants what the amount of rent would otherwise be but for the agreement to repair and maintain the property.

54.    At bottom, and as further described herein, Defendants' design their marketing to induce and convince prospective customers that they are renting a specially-chosen, i.e., "qualified" and quality home that is different than, and an alternative to, a traditional rental. Then, Defendants convince consumers to agree to take on substantial homecare burdens foisted on tenants by Defendants' adhesive form leases.[12]

55.    Despite their effort to establish an extra-legal relationship with their tenants through these elaborate contracts of adhesion, Defendants cannot write their way out of their statutory legal obligations to their tenants.

---

[12] https://www.homepartners.com/how-it-works/program-summary?position=advantages (last visited December 4, 2023).

II.    **Defendants' Form Contracts Shift the Burden of Maintenance, Repair, and Insurance onto Tenants.**

56.    Since 2012, Defendant Home Partners has included provisions in its carefully crafted form leases that illegally purport to shift its repair and maintenance obligations onto tenants, as well as other fees associated with lease and property management administration. While Home Partners names one of its various LLCs (such as HPA US1 LLC) as the Landlord in its leases, the LLC entity is controlled and wholly owned by Home Partners.

57.    Initially, Defendant Home Partners disclaims in its form leases any obligation to comply with the Covenants of Habitability, stating, "[r]esident acknowledges that any damage to the Premises beyond Wear and Tear will be presumed to have been caused by Resident. Resident agrees that Owner is leasing the Premises to Resident in its AS-IS, WHERE-IS, WITH ALL FAULTS condition as of the Effective Date and specifically and expressly without any warranties, representations or guarantees, either express or implied, as to its condition, fitness for any particular purpose, merchantability or any other warranty of any kind, nature or type whatsoever from or on behalf of Owner's Agents (all of which are expressly disclaimed by Owner and waived by Resident) and Resident is accepting the Premises on such terms […]"

58.    Defendants also state **"[t]he amount of Rent was agreed upon based on the express understanding that Resident will be responsible for the maintenance needs of the Premises as provided in this Lease and in the absence of Resident's agreement to maintain the Premises at Resident's cost**

**in accordance with the terms of this Lease, Owner would have charged a higher Monthly Base Rent amount"** (emphasis in original).

59.    This statement is untrue. Defendants do not negotiate rent

60.    Defendants' leases purport to exempt Defendants from liability, stating Defendants "shall not be liable for any injury or harm to any person or property caused by a defective condition at the Premises" and Defendants "shall be released and discharged from all Claims arising out of any Resident's, Occupant's or their guests or invitees use of, or acts or omissions in or about the Premises or arising out of this Lease."

61.    These provisions purport to exempt Defendants from liability for damages for injuries to tenants and their property resulting from Defendants' negligence in the operation or maintenance of their rental properties in violation of Illinois law and are therefore void and wholly unenforceable.

62.    These provisions are designed to obscure, mislead, and misrepresent Defendants' true legal obligations to renters, and constitute false statements of fact and law.

63.    Defendants fail to disclose that nothing in their lengthy "Residential Lease Agreement" can abridge a tenant's rights, nor does the lease create anything other than a traditional landlord-tenant relationship.

64.    Defendants' "as-is" and burden-shifting repair provisions mislead consumers about their guaranteed rights and remedies under applicable state law by misrepresenting to consumers that they, not Defendants, are required to keep

Defendants' properties in reasonable repair, and further mislead consumers into paying costs associated with Defendants' lease management and administration. Thus, in addition to misrepresenting tenants' rights, Defendants' leases are agreements with tenants that purport to waive or modify the Covenants of Habitability in direct violation of the law.

65. Defendants' burden-shifting maintenance and repair and lease administration provisions not only contravene the warranty of habitability and other state laws, but also deceptively and misleadingly suggest to tenants that their signatures on the lease constitute a waiver of their right to habitable housing. Such unlawful provisions have and continue to have the effect of fraudulently stripping consumers of their legal rights and burdening them with repair efforts and expenses that the law explicitly requires Defendants to bear.

66. When purchasing homes for re-lease, Defendants obtain independent inspections and property appraisals, allegedly for the benefit of the tenant, yet under Defendants' policies, the inspection reports and appraisals are not provided to tenants.

67. Instead, these inspections and appraisals are given to Defendants and undertaken on Defendants' behalf prior to Home Partners' purchase of the home. As owners and property managers of the home, Defendants are in the best position to obtain and provide that information. However, no Defendant discloses the existence of any pre-existing damage to the home of which they may have already been aware.

68.    Nor do Defendants disclose the results of municipal inspections. Accordingly, tenants may not be on notice of conditions at the property to review and report during the tenancy, even conditions affecting habitability such as prior mold or mildew.

69.    Despite its claim that it "is happy to handle large service requests, and we ask that residents take care of smaller maintenance issues," Pathlight, as the property management arm of Defendants, does not have a local staff to handle these "large service requests." Instead, Pathlight contracts with a third party, SMS Assist, which determines whether a tenant's maintenance request will be fulfilled by a local vendor under policies and procedures established by Pathlight.

70.    Under Defendants' leases, policies, and procedures, tenants may make maintenance and other repair requests by calling a central toll-free number, or by making a request through Defendants' resident web "portal." If a tenant calls in a maintenance request, both Pathlight and SMS Assist make an electronic record of the request, which is stored in a database. Pathlight frequently communicates with tenants who have called by responding through the resident portal with a "You Called Us" or "We Called You" signature line. If the request is directed through the portal, an electronic record is also created and stored in the database.

71.    If SMS Assist, Pathlight's agent operating under Pathlight policies and procedures, or Pathlight determines that the request is "resident responsibility," Pathlight will not fulfill the maintenance request will cancel it.

72.    SMS Assist will also request approval directly from Pathlight for certain repairs. If Pathlight denies the request, Pathlight cancels the tenant's work order.

73.    Because Pathlight either directly or through its agent SMS frustrates tenants' attempts to successfully make maintenance requests, the result is a system whereby tenants, not Defendants, are actually or constructively forced to pay for repairs and maintenance that they are not required to make under the lease or applicable state law.

### The Master Resident Liability Program

74.    In addition to paying out of pocket for repairs to Defendants' properties as they arise, or from their security deposits at the end of tenancy, tenants also use their own funds every month to comply with Home Partners' so-called "liability coverage" requirement.

75.    The lease requires tenants to procure renters insurance with general liability coverage in the amount of $300,000 ($500,000 for a house with a pool) for "damage to our property during your lease term."[13]

76.    Home Partners requires tenants to name the Defendants and an entity called POPIC LLC, listed in the lease as an "additional interested party" on the policy and provide "written evidence" of the addition prior to move-in.

77.    Although Defendants represent in the leases that tenants are free to obtain their own renters' insurance, the insurance must meet Defendants' coverage

---

[13] https://app.pathlightmgt.com/help/detail/Move-In-and-Liability-Coverage/360043425512/Am-I-required-to-have-renter's-insurance (last visited December 4, 2023).

criteria. If tenants fail to obtain qualified renters' insurance, they are deemed to be in default of their lease.

78.    Nevertheless, before the lease is signed, Defendants discourage tenants from procuring outside insurance, stating the "cost of outside coverage may depend on your provider, creditworthiness, and other factors. Also, it may or may not cover personal belongings," and that "using an outside provider may cost $20 a month or more."[14]

79.    Instead, Defendants want tenants to use their own insurance program. Unless and until the tenant provides the requisite proof of renters insurance, Defendants force-place tenants in their own "liability waiver" program (also known as the "Master Resident Liability Program," or "MRLP," and identified as "Replacement Renter Insurance" in the lease). The MRLP is an opt-out, not opt-in, program.

80.    Defendants' MRLP costs tenants $13 per month and is defined as "additional rent" under the lease. Like all rent payments, this additional rent payment is paid to the Home Partners Holdings subsidiary that is identified as the "Landlord" under the lease. Upon information and belief, a portion of the $13 fee is returned to Defendants.

81.    Defendant Home Partners developed the Master Resident Liability Program in 2018 and 2019 in Chicago, Illinois.

---

[14] https://app.pathlightmgt.com/help/detail/Move-In-and-Liability-Coverage/360043425512/Am-I-required-to-have-renter's-insurance (last visited December 4, 2023).

82.    Although Home Partners uses the terms "liability coverage" and "Master Resident Liability Program" in the leases and in other documents, in reality, Home Partners is engaging in the sale of insurance to tenants. Home Partners is not licensed to sell insurance in any state in which it does business.

83.    Unbeknownst to tenants who are forced to participate, this $13 is an insurance premium paid to Defendants' captive insurer.[15] Defendants do not disclose what portion of this amount is reserved to pay administrative costs, or to pay claims for property damage.

84.    What Defendants additionally do not disclose is that they intend for tenants (or their independently procured insurance coverage) to pay for and cover pre-existing, accidental, or normal wear and tear damage to Defendants' buildings and real property, not caused by tenants, which are not covered by the typical renters' insurance policy. In other words, Defendants deliberately foist the burden of insuring their own real property onto tenants.

85.    Upon information and belief, Defendant Home Partners has collected millions of dollars from tenants nationwide through the MRLP replacement insurance program, none of which benefits the tenants.

**The UBSF**

86.    Defendants employ a third party, Conservice, to manage those utilities and services kept in Defendants' names, such as water, trash and sewer. Conservice

---

[15] *See Sewall, et al. v. Home Partners Holdings LLC, et al.,* 27-CV-22-10389 (Minn. Dist. Ct.) Index No. 202, Order Certifying Class.

bills the utilities to the tenants, through a separate bill, but all utility amounts are reflected on the tenants' ledgers and tenants can remit payment directly to Defendants.

87.    While most tenants understand they have to pay for the utilities they use, are in fact required to pay more than their use. Defendants also require tenants to pay a "Utility Billing Service Fee" (UBSF). The UBSF is a "pay-to-pay" fee for utilities and services that must be kept in the Landlord and property owners' name, which means tenants pay Defendants for the privilege of also paying for their utilities. Tenants do not have the option to opt out of the UBSF. Though the amount varies state to state, Defendants charge this fee in each state they rent their homes.

88.    Plaintiffs and other tenants' UBSF is at least $7.95 per month. Plaintiffs Sheard and Allen pay a $9.95 UBSF, while Todd's UBSF is $7.95.

89.    In their Anticipated Terms document, Defendants represent the UBSF is to "reimburse" Defendants for "water and other utilities and services bundled with the water bill."

90.    The leases do not disclose the nature and purpose of this charge. Similarly, Defendants' representations on their website(s) do not disclose the nature and purpose of this charge.

91.    In actuality, the UBSF is a fee Defendants assess to tenants to cover the administrative costs of hiring Conservice to bill tenants for utilities. This is also not disclosed in their form leases or Anticipated Terms.

92.     Upon information and belief, a portion of this fee is returned to Defendants and does not reflect the actual administrative costs of managing utilities via Conserve.

***HVAC Filter Fees***

93.     Defendant also required tenants to pay a fee for their "HVAC Filter Program" in the amount of $15 per month. This amount is non-negotiable. Defendant contracts with a third party, Second Nature, to deliver air filters to tenants every 60 days, and per the form lease and addenda thereto, tenants are not permitted to opt out of this payment obligation or supply their own air filters purchased from other sources. The lease further requires tenants to install the filters within two days after delivery, for the purpose of ensuring that the "air quality in your home is safe and your system is functioning properly," meaning that the air filter is specifically for the purpose of ensuring the health and safety of the tenants and the habitability of the units. Further, this cost is shifted even where Defendant agrees that furnace and HVAC cleaning and servicing is the landlord's responsibility under the lease agreement.

94.     Defendants mark up the cost of the air filters, but do not disclose this markup to tenants. Further, upon information and belief, the $15 charge does not reflect the actual cost of the air filters. Only a portion of the fee is paid to Second Nature and Defendants retain a portion.

*Legal Fees*

95.     Finally, Defendants require tenants to pay for Defendants' attorneys to review their ledgers for purposes of determining whether a tenant is allegedly in default on any lease obligation, which is reflected as "Legal Fees Recovery" on tenants' ledgers. Defendants charge the tenants for this attorney review, regardless of whether Defendants attempt to enforce any lease obligation through a legal action.

96.     Even if Defendants did not enforce their illegal lease provisions, these provisions are nonetheless deceptive because consumers who read them are likely to believe they are enforceable, or that they have contractually waived their legal rights not to be responsible for certain costs, as well as repairs to Defendants' own property.

## III.    Plaintiffs' Experiences

### *Donna Sheard and Richard Allen*

97.     Donna Sheard, Richard Allen and their autistic son began renting a Home Partners-owned home through their NRTP program on or around January 12, 2023 in Edwardsville, Illinois. Sheard and Allen were looking for a home in their price range with an open floorplan, fireplace, gas hookup for a grill, tall ceilings, natural light and a separate living area for their son[?].

98.     Sheard and Allen rented through Defendants because Defendants' representations, as described in paragraphs 25-46 above, led them to believe Defendants would provide a quality, pre-inspected home that would not require substantial upkeep or maintenance, based upon the assurance of quality and inspection provided by Defendants.

99.    Sheard and Allen received Defendants' 22-page form "Residential Lease Agreement," which includes 50 additional pages of attachments and addenda for a total of 72 pages, all drafted in Illinois by Home Partners' lawyers in approximately 10-point font. *See* Exhibit A.

100.    The Home Partners entity listed on their lease and owner of the property is SFR Borrower 2022-1 LLC, which has a principal place of business in Chicago, Illinois.

101.    Sheard and Allen were not provided an opportunity to negotiate the amount of rent, nor the yearly rent hikes.

102.    Defendants did not separately negotiate or set forth the list of maintenance and repair responsibilities they required Sheard and Allen to take on.

103.    Defendants have assessed a $9.95 Utility Billing Service Fee for each utility payment. The lease is silent as to the nature and purpose of this fee.

104.    Defendants have also assessed a monthly $15 HVAC filter fee throughout the duration of the lease.

105.    Before move-in, Sheard and Allen received a "Welcome Guide" that stated "all homes undergo a general cleaning of plumbing fixtures, appliances, and other surfaces prior to the Lease start date. This does not include windows, exterior areas, or non-habitable spaces." The "Welcome Guide" further claimed additional keys and garage remotes should be found inside the kitchen.

106.   However, upon move-in, the house was filthy and nothing had been cleaned as promised. Additionally, there were no garage remotes as described, so Sheard paid out-of-pocket for remotes.

107.   Further, despite Defendants' promises in the Welcome Guide and other pre-lease materials promising the home would be move-in ready, the water was not turned on and Sheard had to figure out how to do it herself.

108.   At the start of the lease, Sheard and Allen noted on the move-in condition form that the gas fireplace didn't work and there were no remotes provided, even though the Welcome Guide, which Sheard read, stated Defendants would ensure the fireplace was safe and functional.

109.   Sheard placed a maintenance request for the fireplace on or around January 12, 2023, which was cancelled by Defendants with no explanation. Sheard placed another maintenance request on or around February 10, and Pathlight sent a vendor who determined the gas grill line was leaking and had been fashioned together using an improper kitchen knob. When the gas line was turned on, the entire basement filled with gas. Sheard and the vendor were unable to clear the gas because the basement windows had been caulked shut.

110.   Because Pathlight still hadn't authorized any work to be done on the gas line, Sheard called Pathlight on September 11, 2023 to request maintenance. On October 9, 2023, Pathlight emailed Sheard notifying her the request was closed. Pathlight sent approximately 13 different vendors between February and November. On November 17, vendors came to install a small dual gas fireplace, but cut into a

live wire and connected it to the kitchen lights. The vendors told Sheard this set up would not pass an inspection. The vendors were concerned about undoing the work, so they did not complete the job.

111.    Sheard contacted Pathlight through the resident portal on November 29 and has called them every other day to inform them the work was incomplete and the vendor believed the work they did would fail an inspection. Pathlight has not responded and has not sent any other vendors.

112.    The gas line is not the only issue Sheard and Allen have dealt with during their lease. In July 2023, Sheard sent several pictures of their sinking back stairway to Pathlight through the resident portal. The photographs showed that the concrete and brick were severely gapping and presented a serious tripping hazard. Pathlight did not respond until August 23, and said they had "escalated" the request "to be reassigned for a more responsive vendor." As of the date of this filing, Pathlight has not sent a vendor to address the stairs.

113.    Had Sheard and Allen known of the issues they would experience with the home, and with getting Defendants to agree to make necessary repairs, they would not have rented a home through Defendants' program or would have paid considerably less in rent.

*Gabrielle Todd*

114.    Gabrielle Todd and her family began renting a Home Partners-owned home through the RTP program on or about September 2, 2019, in Plainfield, IL. Todd was looking for a safe home for her family to live in while caring for her mother,

25

who was battling cancer. Todd decided to rent through Defendants because of their representations described in paragraphs 25-46 above, and specifically, because she would be able to "lock down" the price of a home. Todd and her family have grown to value the community they have built around her home.

115.  The Home Partners entity listed on Todd's lease and owner of the property is HPA US1 LLC, which is a Delaware limited liability company whose principal place of business is Chicago, Illinois.

116.  Defendants did not allow Todd an opportunity to negotiate rent nor the list of maintenance and repair responsibilities they required Todd and her family to take on.

117.  Todd received Defendants' 19-page form "Residential Lease Agreement," which includes 42 additional pages of attachments and addenda, for a total of 61 pages, all drafted by Illinois Home Partners' lawyers in approximately 10-point font. *See* Exhibit B.

118.  Todd was not provided an opportunity to negotiate the amount of rent, nor the yearly rent hikes.

119.  Defendants have assessed a $7.95 UBSF for each utility payment. Todd's lease is silent as to the nature and purpose of this fee.

120.  Less than two weeks after moving in, Todd and her family noticed that there were issues with the home's plumbing. On September 13, 2019, Gabrielle placed her first maintenance request through the portal, noting the toilet was leaking and running constantly. Todd reported that the toilet was leaking sewage, which flooded

the bathroom and damaged the drywall and carpet, causing it to smell like sewage for over a month until Pathlight finally sent a vendor to address the drywall issue in November of 2019. Pathlight did not address sections of the affected carpet until January of 2021 and July of 2023.

121.    Since Ms. Todd and her family started living at the property in 2019, they have placed over 190 maintenance requests on the house. These maintenance requests vary from issues related to plumbing, drywall, pest control, flooring, and mold.

122.    Todd's lease purports to exempt Defendants from liability for home repairs by stating "Except for the covenants of Landlord expressly contained in this Lease or other documents executed by Landlord, or as otherwise required or specified by Applicable Laws, Tenant agrees that (a) it is leasing the Premises in its **"AS-IS, WHERE-IS, WITH ALL FAULTS"** condition as of the Effective Date and specifically and expressly without any warranties, representations or guarantees, either express or implied, as to its condition, fitness for any particular purpose, merchantability or any other warranty of any kind, nature, or type whatsoever from or on behalf of Landlord, and (b) Landlord has no obligation to perform any work, supply any materials, incur any expense or make any alterations or improvements to any portion of the Premises" (emphasis in original).

123.    Todd's lease further states "Except to the extent required by Applicable Laws, Landlord shall not be liable for any destruction, damage, loss of personal property, possessions or personal injury to any Occupant (including as may be

27

occasioned by fire, smoke, mold, rain, flood, leaking plumbing, gas or water pipes, water, snow, hail, ice, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane or other causes) or for any damage arising from acts, omissions neglect of Landlord or anyone claiming through Landlord, all of which are expressly waived by Tenant, to the maximum extent waivable under Applicable Law."

124.    Home Partners required Gabrielle Todd to sign a "mold addendum" which provides information regarding the nature of mold, steps to reduce the growth of mold, tenant responsibilities, and a section titled "limitations on landlord liability" among other things.

125.    Todd waited until January 2021 for sections of the affected carpet from the September 13, 2019 incident to be replaced.

126.    In or around November of 2019 Todd and her family started noticing that the leaking toilets and pipes resulted in mold forming at various points throughout the kitchen, the drywall, and the bathroom. Throughout the years, Gabrielle Todd has placed multiple maintenance requests via phone and through the online portal to address plumbing issues, and mold concerns, as per her lease, however, she was often met with responses from Home Partners labeling the various requests as "cosmetic" and closing out work orders.

127.    Todd reported on her Move-In Condition Form in September 2019 that the carpet in the home was stained in several areas. After the September 13, 2019 incident in which the toilets soaked various areas on the carpet, Todd reached out to Home Partners September 24, 2019 mentioning that the smell and remaining

moisture on the carpet made her concerned about mold. From 2019 until June 2021 Todd called, messaged, and opened several work orders concerning the carpet, but these work orders were closed for concerning "cosmetic" issues.

128.    On June 22, 2021, Home Partners sent Todd the following message regarding her ongoing carpet issues: "Hello, Thank you for submitting a maintenance service request, however, this is considered a resident care item. At this time, we will not be moving forward with this request, but are happy to provide vendor recommendations, should you decide to proceed with hiring professional services. Thank you for your cooperation and your understanding!" This message from Defendants came almost two years after Gabrielle Todd put in the original September 13, 2019 maintenance request regarding the carpet. Pathlight finally sent a vendor to remove sections of the in the beginning of July of 2023.

129.    On August 14, 2023, Gabrielle sent a request for a sink repair via the Pathlight residential portal. This maintenance was not addressed until November 2, 2023. Todd and her children were without running water in both the bathroom and kitchen sink until that time.

130.    Had she known of the issues she has experienced during her lease with Defendants – including their failure and/or extreme delay in responding to maintenance requests – Todd would not have rented a home through Defendants' program or would have paid considerably less in rent.

## IV.    Numerous Tenants Nationwide Complain.

131.    Plaintiffs are not alone and represent the experiences of similarly situated tenants. Across the country, numerous complaints have been lodged against

either Home Partners or Pathlight through social media such as LinkedIn or Facebook, through the Better Business Bureau, or in conciliation or housing court litigation, for their failure to return security deposits owed, or to keep their properties in reasonable repair.

132.    As reported by numerous tenants, Defendants often ignore tenant repair requests or wait an inordinate amount of time before addressing the repair.

133.    Pathlight was initially accredited by the Better Business Bureau in December 2016, but its accreditation was revoked in 2022. Pathlight's accreditation has since been reinstated, but the Customer Review page continues to be flooded with a litany of complaints.[16]

134.    Hundreds of these complaints exist against Defendants' various entities. Indeed, private Facebook group called "Home Partners of America—Company of Stolen Dreams" contains over 2,000 members.[17]

135.    Defendants have been subject to numerous suits in housing or small claims actions nationwide, as well as additional actions commenced by the

---

[16] https://www.bbb.org/us/tx/plano/profile/property-management/pathlight-property-management-0875-90620230 (last visited December 4, 2023).

[17] https://www.facebook.com/groups/HomePartnersofAmericaScandalExpose (last visited December 4, 2023).

undersigned counsel on behalf of their clients in Minnesota,[18] Washington,[19] and Colorado.[20]

136.    Only Defendants, however, are aware of the total number of complaints lodged against them, including through Pathlight's resident portal and 800-number.

137.    As demonstrated, these failures to repair or to agree to repair directly contradict Defendants' representations that they will quickly make repairs and be available 24/7. These representations misrepresent the service Defendants in reality provide. Defendants routinely fail to make requested repairs or make insufficient or untimely repairs.

## CLASS ACTION ALLEGATIONS

138.    Plaintiffs bring this action on behalf of themselves and all others similarly situated ("the Class") pursuant to Federal Rule of Civil Procedure 23.

139.    Plaintiffs propose the following Class and Subclass definitions, subject to amendment as appropriate:

> Nationwide Class: All persons who have paid rent and other fees to Defendants pursuant to a residential lease agreement with Defendants in the United States.

> Illinois Class: All persons who have paid rent and other fees to Defendants pursuant to a lease agreement with Defendants in the state of Illinois.

---

[18] *Sewall, et al. v. Home Partners Holdings LLC, et al.,* 27-CV-22-10389 (Minn. Dist. Ct.)

[19] *Richmond, et al. v. Home Partners Holdings LLC, et al.,* 3:22-cv-05704 (W.D. Wash.)

[20] *Curran, et al. v. Home Partners Holdings LLC, et al.,* 1:23-cv-01279 (Colo.)

140.    The Nationwide Class brings claims under Counts I and VIII.

141.    The Illinois Class brings claims under Counts I, II, III, IV, V, VI, VII and VIII.

142.    The following persons are excluded from the above Class definitions:

a.    Any judge or magistrate presiding over this action and the members of their family;

b.    Defendants and any of Defendants' affiliates, parents, or subsidiaries, any entities in which Defendants have a controlling interest, any officer, director or employee of Defendants, any successor or assign of Defendants, anyone employed by counsel in this action;

c.    Persons who properly execute and file a timely request for exclusion from the Class;

d.    Persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; and

e.    Plaintiffs' counsel and Defendants' counsel.

143.    The requirements for class certification under Federal Rule of Civil Procedure 23 are met as follows:

a.    Plaintiffs are informed and believe, and on that basis allege, that there are hundreds of persons who have entered into rental agreements with Home Partners. As such, the members of the

Class are so numerous that joinder of all members in one proceeding would be impracticable.

b.    There are common questions of law and fact common to the Class, including without limitation:

i.    Whether Defendants' contracts of adhesion illegally disclaim the covenants of habitability and violate state laws;

ii.    Whether Defendants' lease provisions mislead;

iii.    Whether Defendants' illegally required tenants obtain insurance to cover damage to Defendants' property;

iv.    Whether Defendants have failed to return security deposits in full compliance with the law;

v.    Whether Defendants mispresented the nature of their services through advertising with the intent to induce persons to sign their contracts of adhesion;

vi.    Whether Defendants' illegal and unenforceable lease provisions are unfair and deceptive trade practices under state statutes;

vii.    Whether the members of the Class are entitled to damages and equitable relief, including injunctive and monetary relief.

c.   The claims of the Plaintiffs are typical of the claims of the members of the Class, who entered into rental agreements with Defendants and are now contractually bound to the misleading and unlawful terms of those agreements that breach the covenants of habitability and severely limit any recourse available to Plaintiffs and all members of the Class.

d.   The Plaintiffs will fairly and adequately represent the members of the Class and have retained counsel who are competent and experienced in class action and complex litigation.

144.  The requirements of Rule 23(b)(2) are met as described below in Plaintiffs' request for injunctive relief.

145.  The requirements of Rule 23(b)(3) are met in that:

a.   The questions of law common to the members of the Class predominate over any questions affecting only individual members.

b.   A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by many individual members of the Class may be relatively small in relation to the costs of litigation, the expense and burden of individual litigation make it difficult, if not impossible, for members of the Class to redress the wrongs done

to them individually. Furthermore, many of the members of the Class may be unaware that claims exist against Defendants.

c.      Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The names and addresses of the members of the Class are available from Defendants. Notice will be provided to the members of the Class via first class mail and/or by the use of techniques and a form of notice similar to those customarily used in class actions.

## COUNT I
## ILLEGAL FEES IN VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
## 815 ILCS 505/1 *et seq.*

### On Behalf of a Nationwide Class, or, Alternatively, an Illinois Subclass

146.    Plaintiffs re-allege all prior paragraphs of this complaint.

147.    Plaintiffs are "persons" as defined by 815 ILCS 505/1(c).

148.    Defendant Home Partners Holdings LLC and HPA US1 LLC each have a principal place of business in Chicago, Illinois.

149.    Under the form leases, Defendants charge multiple illegal fees throughout Plaintiffs' and Class Members' tenancies. The form leases are drafted in Illinois, at Defendants' principal place of business, with the advice of their outside counsel, who are also located in Chicago, Illinois.

150.    ***The MRLP:*** As described in paragraphs 74-85 above, Defendants require tenants to comply with their "liability coverage" requirement for "damage to

35

our property during your lease term."[21] Defendants' "liability coverage" is substance over form—in reality, Defendants have engaged in the unlicensed sale of insurance. Defendants automatically enroll tenants in their Master Resident Liability Program for $13 per month. Defendants induce tenants to enroll in their Master Resident Liability Program by stating "Note that using an outside provider may cost $20 a month or more,"[22] despite the fact that the program does not cover the tenant's personal property.

151.    **UBSF**: As described in paragraphs 86-92 above, Defendants' websites and Anticipated Terms represent their monthly Utility Billing Service Fee is "to reimburse for utilities and service paid for by Landlord." In reality, it covers the administrative costs of hiring a third party, Conservice, to bill tenants for utilities that normally must be kept in the landlord's name, such as water, sewer, and trash. While tenants are also billed for the underlying water, sewer, and trash costs, they must also pay-to-pay for these utilities. This fact is not disclosed in leases, nor in any "Anticipated Terms" sent to Plaintiffs and prospective tenants. Defendants' leases are entirely silent on the nature and purpose of this fee. This fee is at least $7.95 per month. Defendants retain at least a portion of this fee, thus the fee does not reflect the actual cost of administering utilities.

---

[21] https://app.pathlightmgt.com/help/detail/Move-In-and-Liability-Coverage/360043425512/Am-I-required-to-have-renter's-insurance (last visited December 4, 2023).

[22] https://app.pathlightmgt.com/help/detail/Move-In-and-Liability-Coverage/11116760063771/Can-I-use-an-outside-liability-coverage-provider (last visited December 4, 2023)

152.   **HVAC filter fee**: As described in paragraphs 93-94 above, until recently, Defendants required tenants to participate in a mandatory HVAC filter program, through which they charged tenants a mandatory $15 fee each month for HVAC air filter replacements. Defendants represent their mandatory HVAC filter program "ensures that you have the best possible air quality in your home." This fee misleads tenants into believing it is their responsibility to keep the homes in compliance with state and municipal law, when it is actually Defendants' responsibility. Defendants further represent "[e]ach shipment contains the exact number of high-quality filters your home needs at the time you need to change them." Defendants mark up the cost of the air filters, but do not disclose this markup to tenants. The air filters cost Defendants $9 per month. Thus, Defendants receive $6 per month per tenant and the cost of the air filters does not reflect the actual costs to Defendants.

**COUNT II**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE**
**BUSINESS PRACTICES ACT**
**815 ILCS 505/1 *et seq*.**

153.   Plaintiffs re-allege all prior paragraphs of this Complaint.

154.   Plaintiffs are "persons" as defined by 815 ILCS 505/1(c).

155.   Defendant Home Partners Holdings LLC and HPA US1 LLC each have a principal place of business in Chicago, Illinois.

156.   Defendants' leases are drafted by Home Partners' lawyers in Chicago, Illinois. Tenants, including Plaintiffs, enter into Defendants' lease agreements with

Home Partners' entities and receive wiring instructions for their security deposits from Home Partners' acquisitions and leasing teams in Chicago, Illinois.

157.    Tenants, including Plaintiffs, receive all pre-lease documents from Home Partners' leasing and acquisitions teams in Chicago, Illinois.

158.    Under the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA"), "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" […] in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

159.    An act or practice can be unfair, but not deceptive.

160.    Defendants, through their agents, employees and/or subsidiaries, have repeatedly violated the Illinois CFA by knowingly, recklessly, or intentionally concealing, suppressing, misrepresenting, omitting, and/or failing to disclose material facts regarding Defendants' rental properties, rental practices, and practices as a landlord.

161.    Defendants, through their agents, employees and/or subsidiaries, have repeatedly violated the Illinois CFA by knowingly or recklessly making false or

misleading statements of fact and other representations regarding the characteristics and benefits of their properties and property management services.

162.   Defendants' misrepresentations and unfair practices begin with dissemination of misleading information on their websites and Anticipated Terms documents, which are directed to tenants and their real estate agents and are intended to induce prospective tenants to enter leases. These misrepresentations, as set forth in paragraphs 25-46 above, falsely assure prospective tenants that they will not be undertaking onerous obligations under the leases. Even if Defendants could legally shift the burden of maintenance and repair onto tenants through their leases—which as noted above, they have not done—these statements have the capacity to deceive. Tenants later learn that Defendants' leases and properties carry repair and maintenance obligations tenants did not intend to take on.

163.   Defendants intended to induce Plaintiffs and the Class rely on their misrepresentations and omissions in promoting and renting Defendants' rental properties.

164.   Thus, Defendants' conduct, practices, and actions described in this Complaint, with the intent that others rely thereon in connection with Defendants' rental practices, constitute multiple separate violations of the Illinois CFA.

165.   Defendants' unfair or deceptive acts or practices had a tendency or capacity to mislead and create a false impression in consumers, and were likely to, and did in fact, deceive reasonable consumers, including Plaintiffs and the Class, about the true nature of Defendants' rental properties, rental practices, and landlord

practices, and the maintenance and repair obligations the tenants were required to assume under the leases.

166.    Defendants' misrepresentations and omissions were material to Plaintiffs and the Class because they impact basic human needs: shelter, health and safety.

167.    Had Plaintiffs and the Class known the truth and true value of Defendants' rental properties, they would not have rented a home through Defendants, or they would have paid significantly reduced rent.

168.    Plaintiffs and the Class had no way of discerning Defendants' misrepresentations were false and misleading, and did not and could not have unraveled Defendants' deception on their own.

169.    Defendants had an ongoing duty to consumers, including Plaintiffs and the Class, not only to refrain from their unfair and/or deceptive representations and practices, but Defendants also had a duty to disclose all material facts concerning the rental properties because they possessed exclusive knowledge of the condition of and defects within the properties and the rental services they would actually provide.

170.    As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiffs and the Class have suffered, and will continue to suffer injury, ascertainable losses of money and/or property, and monetary and non-monetary damages, including not receiving the benefit of their bargain.

171.    Defendants' unlawful acts and practices affect the public interest because hundreds, if not thousands, of renters and prospective home buyers in Illinois

are targeted by Defendants' omissions and misstatements, and these omissions and misstatements have the potential to deceive thousands of consumers in the future. The prevention of such false and misleading information is in the public interest. Defendants are sophisticated real estate investors and property managers, and Plaintiffs and the Class have no power to bargain any terms of Defendants' contracts of adhesion.

172.  Plaintiffs and the Class seek damages, an order enjoining Defendants' unfair or deceptive acts and practices, actual damages, reasonable attorney fees and any other just and proper relief available pursuant to 815 ILCS 505/10a.

**COUNT III**
**VIOLATION OF UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**815 ILCS 510/1, *et seq.***

173.  Plaintiffs re-allege all prior paragraphs of this Complaint.

174.  815 ILCS 510/2 subdivision (a) states: A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, he: (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; (7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

175.    Defendants have repeatedly violated 815 ILCS 510/2 subdivision (a), by engaging in the deceptive and fraudulent conduct described in this Complaint with respect to the rental of residential properties. Those deceptive acts and practices include, but are not limited to:

a.    Representing to consumers that they do not negotiate rental rates or purchase prices while requiring consumers to sign leases stating that such amounts have been negotiated;

b.    Representing to consumers that they take the property "AS IS" and must make and pay for maintenance and repairs to Defendants' rental homes, when in reality, the law requires that Defendants, not tenants, keep the homes in reasonable repair and in compliance with applicable health and safety laws;

c.    Representing to consumers that they must pay for Renters Insurance every month to cover the maintenance of rental homes when the law requires that they, not tenants, keep the homes in reasonable repair and in compliance with applicable health and safety laws;

d.    Representing that consumers must pay fees related to lease management and administration, such as the UBSF, HVAC filter fees, "legal services recovery" for an attorney to review a tenant's file, as well as cumulative late fees.

176.    Defendants' conduct, practices, and actions described in this Complaint constitute multiple separate violations of 815 ILCS 510/2.

## COUNT IV
## VIOLATION OF THE ILLINOIS LANDLORD TENANT ACT
## 765 ILCS 742/5

177.    Plaintiffs re-allege all prior paragraphs of this Complaint.

178.    Under 765 ILCS 742/5, "if a repair is required under a residential lease agreement or required under a law, administrative rule, or local ordinance or regulation, and the reasonable cost of the repair does not exceed the lesser of $500 or one-half of the monthly rent, the tenant may notify the landlord in writing […] of the tenant's intention to have the repair made at the landlord's expense."

179.    If the landlord fails to make the repair within 14 days after tenant's notice, or more promptly as emergency conditions require, the tenant may have the repair made "in a workmanlike manner and in compliance with the appropriate law, administrative rule, or local ordinance or regulation." *Id*.

180.    After submitting the paid bill to the landlord, the tenant may deduct from his or her rent the amount of the bill.

181.    Defendants' leases are illegal because they prohibit Plaintiffs and the Class from withholding rent. Plaintiff Todd's lease states "[t]enant agrees that it shall not have the right to deduct, withhold or offset any portion of the Rent from any claim it may have against Landlord, in any action by Tenant" and Plaintiffs Sheard and Allen's lease states they "shall not have the right" to "set off or deduct the cost of any repairs against Rent due or otherwise withhold Rent."

43

182.    Defendants' leases and leasing practices as described herein violate the Illinois LTA.

## COUNT V
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

183.    Plaintiffs re-allege all prior paragraphs of this Complaint.

184.    Every agreement between Plaintiffs and Defendants includes terms and conditions which are not formally expressed but are implied by law. These implied terms are as binding as the terms that are in the written agreement.

185.    Defendants' residential leases contain a contractual duty of good faith and fair dealing that includes, but is not limited to, maintaining their rental properties in accordance with state law, including but not limited to refraining from the unfair, deceptive and misleading practices described herein.

186.    Defendants control the performance of virtually every term of their contractual relationship with tenants, including, but not limited to:

     a.    the type of insurance tenants must carry and what that insurance covers;

     b.    the manner in which tenants pay utilities and their rent;

     c.    the type, cost and delivery of mandatory HVAC filter replacements;

     d.    whether Defendants or tenants are responsible for certain repairs;

     e.    whether Defendants will agree to make requested repairs and maintenance;

f.   the length of time tenants must wait for maintenance and repairs to be completed (if at all);

g.   forcing tenants to be on-site at the rental property when maintenance and repairs are to occur;

h.   whether Defendants will accept rent payment through the resident portal; and

i.   deductions from tenants' security deposits upon termination of the lease.

187.   Defendants' residential leases contain provisions that defer a decision regarding performance terms of the contract, leaving Defendants with the sole power to control the terms of performance after formation.

188.   Defendants' obligation to abide by the duty of good faith and fair dealing is heightened by the imbalance of power between Plaintiffs and Defendants. This substantial imbalance allows Defendants to implement the business scheme described herein and incorporated by reference. Defendants maintain unilateral discretion under their written agreements, which they abuse in bad faith.

189.   Defendants' actions and uniform course of conduct, including, but not limited to their unfair and deceptive practices, constructive refusal to make repairs and maintenance, and their unduly delay of repairs, breach their duty of good faith and fair dealing and unjustifiably hinder Plaintiffs' performance under the contracts.

190. Further, Defendants' practices defy the reasonable expectations of Plaintiffs and the Class in entering into the landlord-tenant relationship, including, without limitation:

a. Their reasonable expectations that the property is "professionally managed" with "excellent customer service" and "24/7 emergency maintenance service";[23]

b. Their reasonable expectations that their landlord will make timely repairs and maintenance;

c. Their reasonable expectations that they will not be responsible for paying out-of-pocket for maintenance and repairs to the landlord's property; and

d. Their reasonable expectations that they will be permitted to use Defendants' rental portal and 800 numbers at all times for purposes of making a maintenance request, whether routine or emergency;

e. Their reasonable expectations that they will be permitted to make, and for Defendants to accept, full or partial payments of rent amounts charged, whether such amounts are past due or current;

---

[23] https://www.pathlightmgt.com/search (last visited December 4, 2023).

191.    Defendants have acted in bad faith by refusing to perform their contractual duties, effectively foisting the burden of maintaining their homes onto their tenants to generate more revenue and cut their own costs.

192.    Plaintiffs have not impeded Defendants from performing their obligations under their lease agreements in any way.

193.    As a direct and proximate cause of Defendants' breach of the implied duty of good faith and fair dealing, Plaintiffs and the Class have suffered injury and damages.

## COUNT VI
## UNJUST ENRICHMENT

194.    Plaintiffs re-allege all prior paragraphs of this Complaint.

195.    Plaintiffs and the Class conferred a benefit on the Defendants by, among other things, paying rent and for the costs of maintenance that Defendants should have paid.

196.    Defendants voluntarily accepted and retained through today the benefits conferred by Plaintiffs and the Classes' payments for rent and the costs of maintenance. The circumstances are such that it would be inequitable for the Defendants to retain these payments.

197.    Defendants consciously accepted the benefits that Plaintiffs and the Class conferred and those benefits were not conferred gratuitously.

## COUNT VII
## RESCISSION

198.    Plaintiffs re-allege all prior paragraphs of this Complaint.

199.    Defendants control virtually every aspect of Plaintiffs' lease agreements as set forth in the general allegations hereof at paragraphs 47-96.

200.    Defendants' lease agreements illegally and unfairly advantage Defendants through their misleading statements and deceptive practices, as described in this Complaint, with the intent that others rely thereon in connection with the rental or sale of their residential properties. Those practices include Defendants' unlawful lease provisions that deceive and mislead consumers into believing they (a) cannot negotiate their monthly rental rates, while forcing them to sign agreements stating they in fact did, (b) must make repairs to their rental homes because they are rented in an "AS-IS" condition or because Defendants say the repair is "resident responsibility," and (c) must pay for renters' insurance or use Defendants' hand-picked "liability coverage" every month to cover the maintenance of and physical damage to Defendants' rental homes.

201.    Defendants represent to consumers that they must pay for their renters' insurance every month to cover all maintenance of their rental homes when Illinois law requires they, not their tenants, maintain the premises in accordance with the warranty of habitability, illegally shifting the burden of maintaining Defendants' own properties onto their renters.

202.    Defendants' form lease agreements are unconscionable contracts of adhesion, which are unenforceable as contrary to the public interest, policy and law.

203.    Defendants' lease agreements deny consumers the legally cognizable warranty of habitability.

204.    Plaintiffs and the Class have incurred out-of-pocket expenses for maintenance costs associated with their leases that should never have been their responsibility to pay as a direct result of the terms of the lease agreement.

205.    As a direct and proximate result of Defendants' conduct, Defendants have received substantial benefits to which they have no entitlement, at Plaintiffs' and Class Members' expense, including maintenance costs, rent hikes, insurance premiums and other expenses.

206.    Plaintiffs and the Class are entitled to compensation for all of the expenses they were illegally required by Defendants to bear, and that Defendants should have but did not pay.

## COUNT VIII
## DECLARATORY RELIEF

**On Behalf of a Nationwide Class, or, Alternatively, an Illinois Subclass**

207.    Plaintiffs re-allege all prior paragraphs of this Complaint.

208.    An actual controversy has arisen between Plaintiffs and the Class on one hand, and Defendants on the other hand, relating to the following matters:

209.    Whether Defendants have unlawfully imposed maintenance, repair, and payment burdens and obligations on Plaintiffs under form contracts of adhesion.

210.    Whether Defendants have unlawfully failed to maintain the homes rented by Plaintiffs and the Class.

211.    What amounts Plaintiffs and the Class are entitled to receive in compensation.

212.    Whether Defendants unlawfully require tenants to procure renters' insurance to cover damage not caused by tenants to Defendants' building and structures, or to force place them in the "liability coverage" of Defendants' choosing.

213.    Whether the provisions of Defendants' form leases violate the warranty of habitability and illegally thrust the burden of repair onto to tenants.

214.    Whether tenants can be forced to sign agreements stating they either negotiated the rental or purchase price of the home when in fact, no negotiations took place.

215.    Plaintiffs and the Class further seek entry of declaratory judgment under 28 U.S.C. § 2201 in their favor which declares Defendants' practices as unlawful, and which provides for recovery of sums determined by this Court to be owed by Defendants to the Plaintiffs and Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to award judgment against Defendants as follows:

1.    Declaring that Defendants' actions, as set forth above, constitute multiple, separate violations of the common law warranty of habitability; 815 ILCS 505/2; 815 ICLS 510/2; and; declaring that Defendants' form lease agreements are void;

2.    Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or

participation with them, from engaging in deceptive practices and making false or misleading statements in violation of 815 ILCS 505/2, 815 ICLS 510/2;

3.      Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from breaching the common law warranty of habitability;

4.      Awarding judgment against Defendants for restitution and disgorgement under the general equitable powers of this Court and any other authority for all persons injured by Defendants' acts as described in this Complaint;

5.      Awarding Plaintiffs their costs and reasonable attorneys' fees, as provided by applicable law or equity, and as the Court deems just and proper.

6.      Awarding prejudgment interest; and

7.      Granting such further relief as provided by law or equity, or as the Court deems appropriate and just.

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

Date:  December 22, 2023          By: */s/ Gary M. Klinger*
                                       Gary M. Klinger
                                       IL Bar No. 6303726
                                       227 W. Monroe Street, Suite 2100
                                       Chicago, IL 60606
                                       gklinger@milberg.com
                                       (865) 247-0080

                                       Michael Dunn*
                                       **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                                       900 W. Morgan St.

51

Raleigh, NC 27603
(919) 600-5000
michael.dunn@milberg.com


Anne T. Regan*
Lindsey L. Larson*
Amy Ortega*
**HELLMUTH & JOHNSON, PLLC**
8050 West 78th Street
Edina, MN 55439
(952) 941-4005
aregan@hjlawfirm.com
llabellelarson@hjlawfirm.com
aortega@hjlawfirm.com

Susan E. Ellingstad*
Joseph C. Bourne*
Eura Chang*
**Lockridge Grindal Nauen P.L.L.P.**
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401
(612) 339-6900
seellingstad@locklaw.com
jcbourne@locklaw.com
echang@locklaw.com

*(to seek admission, in general, or *pro hac vice*)


**ATTORNEYS FOR PLAINTIFFS**