## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **DONNA SHEARD, RICHARD ALLEN, GABRIELLE TODD, GINA JOHNSON, and LIONEL JOHNSON,** individually and on behalf of all others similarly situated, | |
| **Plaintiff,** | |
| **v.** | **Case No. 3:23-CV-4012-NJR** |
| **HOME PARTNERS HOLDINGS LLC, OPVHHJV LLC, d/b/a PATHLIGHT PROPERTY MANAGEMENT, and HPA US1 LLC,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

In 1986's *The Money Pit*, Tom Hanks and Shelley Long play Walter and Anna, a couple who is lured into purchasing a million-dollar mansion for a mere $200,000. It's only after they move in that the house starts literally falling apart. Walter fixes the front door hinges only to have the entire door frame fall off the house. An electrical fire starts in the kitchen while Walter heats up water for the bath because there is no hot water in the house. While pouring the hot water into the bathtub, the floor gives way underneath and the tub crashes into pieces below. The entire grand staircase collapses, as does Walter and Anna's relationship. In the end, however, the home is repaired along with the couple's bond, and they get married in front of the home. A happy ending.

The Plaintiffs in this case likewise claim they were deceived into renting "quality,"

"move-in ready" homes from Defendant Home Partners Holdings LLC ("Home Partners") only to discover problems like a leaky gas line, a sewage-leaking toilet, mold, no running water, a broken water heater, and a faulty furnace that spewed carbon monoxide. A tree fell on one of the homes and stayed there for three weeks. Plaintiffs further claim that when they notified Defendants about these issues, Defendant Pathlight Property Management ("Pathlight") failed to make repairs in a timely manner, if at all. No Hollywood happy ending here.

On April 1, 2024, Plaintiffs filed a Second Amended Class Action Complaint on behalf of a nationwide class and an Illinois class to redress Defendants' alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Uniform Deceptive Trade Practices Act ("UDTPA"), the Illinois Landlord Tenant Act, and Illinois common law. (Doc. 34). Defendants have now moved to dismiss the Second Amended Class Action Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Doc. 36). For the reasons set forth below, the motion is granted in part.

## BACKGROUND

The following facts are derived from the Second Amended Complaint and taken as true for the purpose of Defendants' motion to dismiss.

Defendants are corporate landlords who collectively own, lease, and manage approximately 17,000 homes in more than 80 markets across the United States. (Doc. 34 at ¶ 1). Defendants operate as alter egos of each other and as a joint entity. (*Id.* at ¶ 2). Home Partners purchases homes through separately incorporated LLCs, including

Defendant HPA US1 LLC, while Pathlight handles the property management aspect of Defendants' rental business. (*Id.* at ¶ 71). The Plaintiffs in this case all signed leases with HPA US1 LLC. (*Id.* at ¶ 20).

Defendants operate two rental programs: a "right-to-purchase" (RTP) program and a "non-right-to-purchase" (NRTP) program. (*Id.* at ¶¶ 2, 40). Under the NRTP program, homes already owned by Defendants are rented to tenants for one-year terms. (*Id.* at ¶ 41). Under the RTP program, a prospective customer finds a home listed on the market, Defendants buy the home, then the customer leases the home from Defendants for up to five years with the option to purchase it at any point. (*Id.* at ¶ 42). Defendants claim that they expend significant effort and resources to purchase a particular home on the prospective tenant's behalf. (*Id.* at ¶ 43). Defendants also represent that their houses are "qualified," "move-in ready," and have passed inspection. (*Id.* at ¶ 45). Defendants do not share the results of any inspection reports or property appraisals with their tenants, and thus tenants are unaware of what repairs, if any, were declined or undertaken. (*Id.* at ¶¶ 45, 68).

Plaintiffs assert that Defendants' marketing is designed to induce prospective customers to believe that they are renting a specially chosen and quality home that is different than a traditional rental. (*Id.* at ¶ 56). Defendants then convince consumers to take on substantial maintenance burdens through their form leases, which illegally shift repair and maintenance obligations onto tenants. (*Id.* at ¶¶ 56, 58).

Whether a tenant chooses the RTP or NRTP program, Defendants' homes are professionally managed by Pathlight. (*Id.* at ¶ 44). Defendants represent that, as the

exclusive property manager, Pathlight offers "excellent customer service, 24/7 emergency maintenance service, online application and payments, and pet-friendly options." (*Id.*). While tenants are responsible for managing small maintenance issues such as pest infestations, lawn care, snow removal, and appliance repair, Defendants claim to "take the responsibility of managing your home's safety and maintenance seriously" and assert that they are "always ready to handle large service requests . . . ." (*Id.* at ¶ 48). However, Pathlight does not have a local staff to handle any such "large service requests." Instead, Pathlight contracts with a third party, SMS Assist, which determines whether a tenant's maintenance request will be fulfilled by a local vendor under policies and procedures established by Pathlight. (*Id.* at ¶ 71). If SMS Assist or Pathlight determines that the request is the resident's responsibility, Pathlight will not fulfill the maintenance request and will cancel it. (*Id.* at ¶ 73). Plaintiffs claim that because Pathlight either directly or through SMS Assist frustrates tenants' attempts to successfully make maintenance requests, the result is a system whereby tenants, not Defendants, are actually or constructively forced to pay for repairs and maintenance that they are not required to make under the lease or applicable state law. (*Id.* at ¶ 75).

Plaintiffs also claim that Defendants do not fully disclose the additional fees that tenants will be required to pay under the lease.

First, tenants are required to comply with Home Partners' "liability coverage" requirement. (*Id.* at ¶ 76). The lease requires tenants to procure renter's insurance with general liability coverage in the amount of $300,000 ($500,000 for a house with a pool) for "damage to our property during your lease term." (*Id.* at ¶ 77). Although Defendants

represent that tenants are free to obtain their own renter's insurance, the insurance must meet Defendants' coverage criteria. (*Id.* at ¶ 79). Furthermore, Defendants discourage tenants from procuring outside insurance, stating the "cost of outside coverage may depend on your provider, creditworthiness, and other factors" and it "may or may not cover personal belongings." (*Id.* at ¶ 80). Defendants also represent that "using an outside provider may cost $20 a month or more." (*Id.*).

Unless and until the tenant provides the requisite proof of adequate renter's insurance, Defendants force-place tenants into their own "Master Resident Liability Program," or "MRLP." (*Id.* at ¶ 81). The MRLP costs $13 per month and is paid to the landlord. (*Id.* at ¶ 82). Plaintiffs allege, on information and belief, that the entire $13 does not go toward insurance and that a portion of the fee is actually returned to Defendants. (*Id.*). Furthermore, Plaintiffs allege, this constitutes the sale of insurance to tenants without a license to do to. (*Id.* at ¶ 84). And, even if tenants pay into the MRLP, they are still required to pay for pre-existing, accidental, or normal wear and tear damage to Defendants' buildings and real property, not caused by tenants. (*Id.* at ¶ 86). Plaintiffs assert Defendant Home Partners has collected millions of dollars from tenants nationwide through the MRLP replacement insurance program, none of which benefits the tenants. (*Id.* at ¶ 87).

Second, Defendants charge a Utility Billing Service Fee ("UBSF") of at least $7.95 per month because Defendants use a third party, Conservice, to manage utilities and services kept in Defendants' names, such as water, trash, and sewer. (*Id.* at ¶¶ 88-90). The UBSF is a fee Defendants assess to tenants to cover the administrative costs of hiring

Conservice to bill tenants for utilities. (*Id.* at ¶ 91). In other words, the USBF is a "pay to pay" fee that is not disclosed in the lease. (*Id.* at ¶ 93). Plaintiffs also allege that the UBSF does not reflect the actual administrative costs of managing utilities via Conservice and that a portion of the UBSF is returned to Defendants. (*Id.* at ¶ 94).

Third, Defendants require tenants to pay $15 per month for their "HVAC Filter Program." (*Id.* at ¶ 95). Air filters are delivered to tenants, and tenants are not allowed to opt out or supply their own HVAC air filters. (*Id.*). Plaintiffs allege Defendants mark up the cost of the air filters and keep a portion of the fee for themselves. (*Id.* at ¶ 96).

Finally, Defendants require tenants to pay for attorneys to review their ledgers to determine whether a tenant is allegedly in default on any lease obligation, which is reflected as "Legal Fees Recovery." (*Id.* at ¶ 97). Defendants charge tenants for this attorney review regardless of whether Defendants attempt to enforce any lease obligation through a legal action. (*Id.*).

**The Named Plaintiffs**

Donna Sheard and Richard Allen rented a house from Home Partners in Edwardsville, Illinois, through the NRTP program. (*Id.* at ¶ 99). They chose to rent through Defendants because they believed, based on Defendants' representations, that Defendants would provide a quality, pre-inspected home that would not require substantial upkeep or maintenance. (*Id.* at ¶ 100). Sheard and Allen were assessed a $9.95 UBSF for each utility payment, as well as a monthly $15 HVAC filter fee. (*Id.* at ¶¶ 105-06). When they moved in, the house was filthy, there were no remotes for the garage, and the water was not turned on. (*Id.* at ¶¶ 108-09).

Sheard and Allen noted on the move-in condition form that the gas fireplace didn't work and there were no remotes provided, even though the Welcome Guide said Defendants would ensure the fireplace was safe and functional. (*Id.* at ¶ 110). Sheard placed a maintenance request for the fireplace on January 12, 2023, which was cancelled by Defendants with no explanation. (*Id.* at ¶ 111). Sheard placed another maintenance request on February 10, and Pathlight sent a vendor who determined the gas grill line was leaking and had been fashioned together using an improper kitchen knob. (*Id.*). When the gas line was turned on, the entire basement filled with gas. (*Id.*). Sheard and the vendor were then unable to clear the gas because the basement windows had been caulked shut. (*Id.*). In November 2023, vendors came to install a small dual gas fireplace, but they cut into a live wire and connected it to the kitchen lights. (*Id.* at ¶ 112). The vendor told Sheard this would not pass inspection, but they did not undo the work. (*Id.*). Sheard contacted Pathlight to tell them the work was incomplete, but Pathlight has not sent any other vendors. (*Id.* at ¶ 113). Sheard and Allen have also dealt with a sinking outdoor stairway, which has yet to be fixed. (*Id.* at ¶ 114).

Gabrielle Todd and her family began renting a Home Partners-owned home through the RTP program on September 2, 2019, in Plainfield, Illinois. (*Id.* at ¶ 116). Todd was assessed a $7.95 USBF fee for each utility payment. (*Id.* at ¶ 121). Less than two weeks after moving in, Todd noticed that a toilet was leaking sewage and running constantly, causing damage to the drywall and carpet. (*Id.* at ¶ 122). It continued to smell like sewage until Pathlight sent a vendor to address the drywall issue in November 2019. (*Id.*). The carpeted portions were not fixed until January 2021 and July 2023. (*Id.*).

Since Todd and her family moved in, they have placed over 190 maintenance requests for issues related to plumbing, drywall, pest control, flooring, and mold. (*Id.* at ¶ 123). At signing, Home Partners required Todd to sign a "mold addendum," which provides information regarding the nature of mold, steps to reduce the growth of mold, tenant responsibilities, and a section titled "limitations on landlord liability" among other things. (*Id.* at ¶ 126). Although Todd has placed multiple requests related to mold in her home, Home Partners has labeled the requests "cosmetic" or a "resident care item," and it has denied the work orders. (*Id.* at ¶ 128-130). Todd and her children also went without running water in the bathroom and kitchen sinks for two and a half months. (*Id.* at ¶ 131).

Lionel and Gina Johnson rented a Home Partners-owned home in Libertyville, Illinois, through the NRTP program on January 14, 2019. (*Id.* at ¶ 133). The Johnsons were assessed a $7.95 UBSF for each utility payment, and they paid for and installed the required HVAC filters. (*Id.* at ¶¶ 138-39). The Johnsons also were assessed a $13 "liability coverage" fee. (*Id.* at ¶ 140).

About a month after they moved in, the Johnsons noticed that water would come up from the bathtub drain when they flushed the toilet. (*Id.* at ¶ 142). They placed a maintenance request via the Pathlight portal, and Pathlight sent a vendor who said the toilet and faulty plumbing would need to be replaced. (*Id.* at ¶ 143). The Johnsons contacted Defendants to inform them of the needed repairs, but they were told the issue had been resolved despite continuing issues with the plumbing. (*Id.*). Defendants refused to reopen the maintenance request or to replace the toilet since the original maintenance request had been marked as resolved. (*Id.*). In September 2019, the hot water went out

completely, so the Johnsons could not use the showers, sinks, dishwasher, or washer. (*Id.* at ¶ 144). They called and messaged Pathlight but it never sent a vendor to address the issues. (*Id.*).

That same month, the carbon monoxide alarms went off throughout the house. (*Id.* at ¶ 145). The fire department and gas company determined there were unsafe levels of carbon monoxide in the home. (*Id.*). Lionel Johnson contacted the Pathlight emergency line to report the incident. (*Id.*). Pathlight sent a vendor the following day who could not perform the repairs, although another vendor completed the repairs a week later. (*Id.*). Shortly thereafter, the carbon monoxide alarms went off again. (*Id.* at ¶ 146). Despite multiple calls and emails, Pathlight did not replace the furnace in the home for another two or three months. (*Id.*).

Toward the end of 2019, the Johnsons noticed various leaks throughout the roof of the house. (*Id.* at ¶ 147). In February 2020, the bathroom tiles started coming loose, and the roof in one of their children's rooms began leaking. (*Id.*). By August 2021, black mold began appearing on the ceiling. (*Id.*). Then, a large tree fell on the home. (*Id.* at ¶ 148). Defendants did not send a vendor to remove the tree for over three weeks. (*Id.*). The Johnsons had to vacate the property and pay out of pocket for a hotel, and they were never reimbursed by Defendants. (*Id.*).

All named Plaintiffs claim that, had they known of the issues they would have with their homes—and with getting Defendants to make the necessary repairs—they would not have rented a home through Defendants' program or would have paid less in rent. Plaintiffs further claim that numerous complaints have been lodged against

Pathlight and Home Partners across the country. (*Id.* at ¶ 150). They assert that numerous tenants have reported that Defendants often ignore their repair requests or wait an inordinate amount of time before addressing the repair. (*Id.* at ¶ 151).

Plaintiffs filed the Second Amended Class Action Complaint in this action on behalf of a nationwide class and an Illinois class. (Doc. 34). The proposed nationwide class (or, alternatively, an Illinois subclass) brings one count alleging Defendants charged multiple illegal fees in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (Count I), and one count for declaratory judgment under 28 U.S.C. § 2201 (Count VIII). On behalf of the Illinois class, Plaintiffs allege a violation of the ICFA (Count II), violation of the Illinois Uniform Deceptive Trade Practices Act (Count III), violation of the Illinois Landlord Tenant Act (Count IV), breach of the duty of good faith and fair dealing (Count V), unjust enrichment (Count VI), and rescission (Count VII). They seek declaratory relief, injunctive relief, compensatory damages, and attorneys' fees and costs.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). The Court accepts as true the complaint's well-pleaded factual allegations and draws all reasonable inferences—but not legal conclusions—in the plaintiff's favor. *Burke v. 401 N. Wabash Venture, LLC,* 714 F.3d 501, 504 (7th Cir. 2013).

To survive a Rule 12(b)(6) motion, the plaintiff only needs to allege enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 570 (2007). A plaintiff need not plead detailed factual allegations, but must

provide "more than labels and conclusions, and a formulaic recitation of the elements."

*Id.* "Plausibility does not mean probability: a court reviewing a 12(b)(6) motion must 'ask

itself *could* these things have happened, not *did* they happen." *Huri v. Off. of the Chief Judge*

*of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833 (7th Cir. 2015) (quoting *Swanson v. Citibank,*

*N.A.*, 614 F.3d 400, 405 (7th Cir. 2010)). "The standard simply calls for enough facts to

raise a reasonable expectation that discovery will reveal evidence supporting the

allegations." *Id.* (citing *Olson v. Champaign Cnty.*, 784 F.3d 1093, 1098 (7th Cir. 2015)); *see*

*also Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 645 (7th Cir. 2022) ("all a complaint

must do is state a plausible narrative of a legal grievance that, if proved, would entitle

the plaintiff to relief").

## I.    Illinois Consumer Fraud and Deceptive Business Practices Act

### A.  The ICFA and the Reasonable Consumer Standard

Generally, the ICFA protects consumers against unfair or deceptive acts or

practices, including but not limited to the use of deception, fraud, false pretense, false

promise, misrepresentation, or concealment, or the omission of any material fact. 815 ILL.

COMP. STAT. § 505/2. To state a claim under the ICFA, a plaintiff must plead facts

demonstrating that: (1) the defendant committed a deceptive or unfair act; (2) the

defendant intended that others rely on the deception; (3) the act occurred in the course of

trade or commerce; and (4) the act caused actual damages. *Benson v. Fannie May*

*Confections Brands, Inc.,* 944 F.3d 639, 646 (7th Cir. 2019) (citing *Vanzant v. Hill's Pet*

*Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019)). Illinois courts have interpreted the statute

to be disjunctive, "allowing separate claims for unfair acts or practices and deceptive acts or practices." *Boone v. MB Fin. Bank, N.A.*, 375 F. Supp. 3d 987, 996 (N.D. Ill. 2019) (citation omitted).

Courts apply a "reasonable consumer" standard when analyzing the likelihood of deception. *Benson*, 944 F.3d at 646. "[W]hen analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Id.* (quoting *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005)). "Deception does not exist if a consumer has been alerted to the possibility of the complained-of result." *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1001 (7th Cir. 2018).

"To determine whether a practice is unfair within the meaning of the ICFA, courts look to three factors: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and/or] (3) whether it causes substantial injury to consumers." *Kahn v. Walmart Inc.*, 107 F.4th 585, 602 (7th Cir. 2024) (citation omitted). "Whether a practice is immoral, unethical, oppressive, or unscrupulous depends on whether it has left the consumer with little choice but to submit to it." *Id.* (quoting *Newman*, 885 F.3d at 1002–03).

ICFA claims of deception or unfair practices are analyzed under the heightened pleading standard of Rule 9(b) when they "sound in fraud." *Haywood*, 887 F.3d at 333. Rule 9(b) requires a complaint to "state with particularity the circumstances constituting fraud," *i.e.*, "who, what, when, where, and how of the fraud." *Id.*

**B. Count I: Illegal Fees on Behalf of a Nationwide Class or, Alternatively, an Illinois Subclass**

In Count I, Plaintiffs, on behalf of a nationwide class or, alternatively, an Illinois class, allege that the MRLP, the UBSF, and the HVAC filter fee are illegal fees under the ICFA. The Court addresses each fee in turn.

1. MRLP

The Second Amended Complaint alleges that the MRLP is deceptive and unfair because Defendants automatically enroll tenants in the program for $13 per month. Defendants also induce tenants to enroll in the MRLP by claiming that an outside provider may charge $20 per month or more. Finally, Plaintiffs claim Defendants are engaged in the unlicensed sale of insurance, which violates public policy.

In their Motion to Dismiss, Defendants assert that only the Johnsons have standing to challenge the MRLP, as they are the only named Plaintiffs that actually paid the fee. Also, the fee cannot be deceptive, they argue, because it is disclosed as "additional rent," the MRLP program is discussed in the "Insurance" section of the lease, and Plaintiffs agreed to these provisions. Moreover, Plaintiffs do not point to any allegedly deceptive statements about the MRLP in their leases or elsewhere.

In response, Plaintiffs argue that the MRLP is deceptive because Defendants have omitted key facts about the fee and marked up the cost of the service without disclosing that they derived compensation from it. Plaintiffs also argue they were automatically placed into the MRLP, did not have a meaningful choice to procure their own insurance, and were discouraged by Defendants from purchasing their own insurance because it

may cost more. Finally, Plaintiffs contend that Defendants' sale of insurance without a license violates public policy.

Plaintiffs do not dispute that only the Johnsons paid the MRLP, so the Court looks only to the Johnsons' lease to determine whether Plaintiffs have sufficiently alleged that the MRLP was deceptive or unfair.[1]

The MRLP is explained on pages 6 to 7 of the Johnsons' lease. The section titled "12. **INSURANCE; LIMITATION OF LIABILITY**" states, in relevant part:

> **During the Term, Tenant shall maintain in full force and effect, renter's insurance ("Renter's Insurance") on an occurrence basis which must include (1) general liability coverage in an amount of not less than $300,000.00 (or such higher amount as may be required by any Pool/Spa or other Addendum now or hereafter made a part of this Lease) and (2) personal property coverage in an amount that Tenant deems sufficient to cover the repair or replacement costs of any loss to Tenant's personal property located at the Premises**. Tenant is required to (a) cause Landlord to be named as an "additional interested party" (or similar status) on the general liability portion of the Renter's Insurance policy, (b) cause the insurer or agent to provide Landlord with written evidence of such insurance prior to taking-possession of the Premises (e.g., by delivery of a certificate of insurance) and (c) take all actions necessary for Landlord to be notified by the issuer of the Renter's Insurance if such coverage is terminated or not renewed . . . .
>
> **Tenant's failure to maintain or provide evidence of the required Renter's Insurance is a default under this Lease and may result in**, with or without notice to Tenant and/or Tenant's opportunity to cure (except as otherwise provided by Applicable Laws), **Landlord's purchasing insurance up to the amounts specified herein for Renter's Insurance** (such insurance being referred to herein as "Replacement Renter Insurance"), in which event (A) **the cost of such Replacement Renter Insurance plus an administrative fee in the amount of $3.00** for each month or partial month during the period during which such Replacement Renter Insurance is applicable (or, if lower, the maximum amount of such administrative fee as

---

[1] At the motion to dismiss stage, a court may consider "the complaint itself, documents that are attached to the complaint, [and] documents that are central to the complaint and referred to in it . . . ." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Plaintiffs have attached their leases to the Second Amended Complaint and refer to their contents, so the Court will consider them in ruling on Defendants' motion.

is permitted by Applicable Law, **it being understood and agreed that such administrative fee is a fair and reasonable estimate of actual expenses incurred by Landlord as a result of having to obtain the Replacement Renter Insurance and that the amount of actual expenses are not susceptible to ready calculation but include Landlord's costs of communicating with Tenant, and increased accounting and administrative expenses resulting from Tenant's failure to provide Landlord with evidence of the required Renter's Insurance) shall constitute Additional Rent payable by Tenant with Tenant's next Monthly Base Rent payment due** . . . .

(Doc. 34-3 at pp. 7-8) (emphasis added).

Based on this contractual language, the Court rejects Plaintiffs' claim that the MRLP fee is deceptive or unfair. The terms of the lease clearly set forth the tenant's obligation to procure Renter's Insurance, as well as the consequences of failing to do so. The lease explains that if the tenant does not provide evidence of Renter's Insurance, then Defendants will obtain the insurance themselves. The cost of insurance will also include an administrative fee, and by agreeing to the Lease terms, the tenant agrees that the administrative fee is a fair and reasonable estimate of expenses incurred by the landlord in obtaining the insurance. The fact that there is an additional administrative fee that goes back to Defendants is not deceptive or unfair—it is clearly set forth in the lease terms. *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 609 (7th Cir. 2013) (finding plaintiff failed to state an ICFA claim when mortgagee informed mortgagor of consequence of failing to maintain hazard insurance on the property and it was disclosed that the price of mortgagee-obtained insurance may include compensation to the mortgagee to cover administrative costs).

Plaintiffs argue that *Cohen* is distinguishable because, in *Cohen*, the Seventh Circuit

found the plaintiff "never lacked a meaningful choice to avoid expensive lender-placed property insurance." *Id.* at 610. But here, Plaintiffs allege that Defendants "force-place" them onto Defendants' insurance unless and until the tenant provides the requisite proof of adequate renter's insurance and even discourage them from obtaining their own insurance, which may be more expensive. The Court fails to see how this situation is different from *Cohen*. The lease specifies that the tenant must obtain Renter's Insurance, and only if they fail to do so will Defendants purchase insurance to cover the property. (Doc. 34-3 at p. 8). Even if Defendants "discouraged" Plaintiffs from obtaining their own (more expensive) insurance, discouraging tenants from obtaining their own insurance is not the same as forcing them participate in Defendants' liability program. Plaintiffs were aware of the MRLP fee and could have sought their own insurance if they chose to do so.

Finally, Plaintiffs' claim that Defendants are engaging in the unlicensed sale of insurance in violation of Illinois's public policy is also defeated by the lease terms. The lease states that if the tenant does not obtain Renter's Insurance, Defendants will purchase insurance for the tenant and the cost will constitute additional rent to be paid by the tenant. (Doc. 34-3 at p. 8). Defendants are not selling insurance; they are purchasing it to insure their properties and passing the cost along to tenants.

The Court finds that the MRLP fee is not deceptive or unfair under the ICFA.

2.  UBSF

In Count I, Plaintiffs aver that the UBSF is deceptive because Defendants' websites and their "Anticipated Terms" represent the UBSF is to "reimburse for utilities and service paid for by Landlord." (Doc. 34 at ¶ 170). In reality, however, the fee covers the

administrative costs of hiring a third party to bill tenants for utilities. Plaintiffs claim the leases are silent as to the nature and purpose of the fee, and that a portion of the fee is actually retained by Defendants. Defendants counter that the UBSF is disclosed in each lease, and thus cannot be deceptive.

Each named Plaintiff paid the UBSF, so the Court has reviewed each lease accordingly. The Todd and Johnson leases contain a section titled "**BASIC LEASE INFORMATION."** Within this section, the tenant is informed of the Monthly Base Rent, the address of the rental Premises, the amount of the Security Deposit, and the amount of the UBSF, among other information. (*See* Docs. 34-1; 34-2; Doc. 34-3). A section titled "Utilities and Services" then explains that the "Tenant shall pay Landlord, as Additional Rent: (a) the Utility Billing Service Fee along with the Monthly Base Rent for each month where Landlord provides Tenant a bill for reimbursement for any Excluded Utility & Service . . . ." (Doc. 34-2 at p. 12; Doc. 34-3 at p. 6).

The Sheard lease contains a "Key Provisions Summary," within which a section on "Fees" includes the UBSF. (Doc. 34-1 at p. 5). Its section on "Utilities and Services" states that the "Resident shall pay for all Utilities & Services supplied to and consumed in, on, about or related to the Premises, together with the Utility Billing Service Fee and any similar or related fee whether billable to the Resident directly or passed through by Owner . . . ." (*Id.* at p. 19).

When looking at the totality of the information available to the Plaintiffs, they have failed to adequately allege that the UBSF was deceptive. A reasonable consumer would understand the UBSF was a "service fee" imposed for the billing of utilities. While

Plaintiffs claim Defendants kept some of the UBSF as profit, they do not identify any

deceptive representations that led them to this belief. *See Ahrendt v. Condocerts.com, Inc.*,

No. 17-CV-8418, 2018 WL 2193140, at *3 (N.D. Ill. May 14, 2018) (rejecting ICFA claim that

the defendant kept a portion of its "exorbitant fees" where the plaintiff failed to identify

any deceptive representations or wrongdoing beyond defendant charging a high price

for its services). Here, Plaintiffs were made aware of the UBSF within the first few pages

of their leases, and they agreed to pay it. The Court finds nothing deceptive about the

UBSF.

### 3.  HVAC Filter Fee

Finally, Plaintiffs claim that the HVAC filter fee is deceptive because it misleads

tenants into believing it is their responsibility to keep the homes in compliance with state

and municipal law when it is actually Defendants' responsibility. Plaintiffs also claim that

Defendants mark up the cost of the air filters, but do not disclose this markup to tenants.

Defendants argue that the HVAC filter fee was not deceptive because it was disclosed in

the lease, its purpose was explained in the lease, and Plaintiffs agreed to pay the fee.

Only Sheard and Allen allege they were charged an HVAC filter fee. Their lease

lists the HVAC filter fee of $15 per month under the section titled "VI. Fees" of the Key

Provisions Summary. (Doc. 34-1 at p. 4). Sheard and Allen also signed an HVAC Air Filter

Addendum, which explains that, to assist residents with fulfilling their maintenance

obligations, one HVAC filter will be delivered to the premises on an appropriate

schedule. (*Id.* at p. 52). The Addendum then directs that the resident shall install the filter

within two days of receipt; the resident must date each filter prior to installing it; the

resident shall inform the owner in writing if they are unable to timely replace a filter; the resident shall be liable to the owner for all damages caused to the premises by the resident's failure to timely replace the HVAC filter; and the resident shall inform the owner if they do not receive the filter in a timely fashion. (*Id.*). The Addendum further provides that the resident shall pay the HVAC filter fee each month. (*Id.*).

Plaintiffs' allegations simply do not support a claim for deception under the ICFA. The HVAC filter fee was clearly set out in the lease, Plaintiffs agreed to and signed the HVAC Air Filter Addendum, and there is no allegation that Plaintiffs did not receive the air filters they paid for. *See Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 962 (Ill. 2002) (plaintiffs failed to allege sufficient facts to establish deceptive conduct where the fee was clearly set out in the lease).

Plaintiffs' assertion that the HVAC filter fee is unfair because it shifts the burden of keeping the home in compliance with state and municipal law to tenants, when it is actually Defendants' responsibility, also falls short. Plaintiffs have pointed to no language in the lease or HVAC Air Filter Addendum that would lead a reasonable consumer to believe that the tenant—rather than the landlord—must keep the home in compliance with state and municipal law. Indeed, the HVAC Air Filter Addendum states that its purpose is to "assist" tenants with "fulfilling [their] maintenance obligations of the Premises." (Doc. 34-1 at p. 52). The lease then fully explains the "Owner's Maintenance and Repair Obligations," which includes any items that "Applicable Laws require to be maintained by Owner." (Doc. 34-1 at p. 15). Because the terms of the lease clearly provide that the Owner is responsible for maintaining the home as required by law, Plaintiffs

have failed to allege sufficient facts to demonstrate that the HVAC Filter Fee constitutes an unfair practice.

### 4. Unfairness of MRLP, UBSF, and HVAC Filter Fees

Finally, Plaintiffs claim that the MRLP, UBSF, and HVAC filter fees are unfair because they have no choice but to pay them or risk eviction or non-renewal of their lease. This argument lacks merit because Plaintiffs chose to rent their homes through Defendants. *See Leszanczuk v. Carrington Mortg. Servs., LLC*, 21 F.4th 933, 943 (7th Cir. 2021) ("[Plaintiff] reasonably could have avoided the inspection fee by contracting with a different mortgage servicer."). Although Plaintiffs argue that they pleaded Defendants have displaced traditional single-family home landlords, the Court need not accept *implausible* allegations as true. Home Partners has not completely taken over the single-family home rental market such that other private or corporate landlords no longer exist.[2] Thus, they have failed to allege "type of oppressiveness and lack of meaningful choice necessary to establish unfairness." *Robinson*, 775 N.E.2d at 419.

Because Plaintiffs' complaint fails to adequately allege that the fees charged by Defendants are deceptive or unfair under the ICFA, their claims in Count I as to both the nationwide class and Illinois class are dismissed.

## II. Declaratory Judgment

In Count VIII, the only other count brought on behalf of a nationwide class, Plaintiffs seek a declaration pursuant to 28 U.S.C. § 2201 that Defendants' practices are

---

[2] Indeed, a search of Home Partners' website, to which Plaintiffs link extensively in the Second Amended Complaint, reveals only one home available for rent in the Southern District of Illinois. *See* https://www.pathlightmgt.com/search?state=IL&page=all (last visited Nov. 8, 2024).

unlawful. Because the Court has determined that Plaintiffs have not adequately alleged the MRLP, USBF, and HVAC Filter Fee are deceptive or unfair under Illinois law, the nationwide class is not entitled to declaratory relief. Count VIII is dismissed as to the nationwide class.

## III.    Subject Matter Jurisdiction and Abstention under § 1332(d)(4)

With only an Illinois class remaining, the Court must address its subject matter jurisdiction. *See Foster v. Hill*, 497 F.3d 695, 696-97 (7th Cir. 2007) ("It is the responsibility of a court to make an independent evaluation of whether subject matter jurisdiction exists in every case."). This case was filed under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), "which creates jurisdiction when three requirements are met: the amount in controversy exceeds $5 million, at least one class member and any defendant are citizens of different states, and there are at least 100 class members." *Johnson v. Diakon Logistics, Inc.*, 44 F.4th 1048, 1050 (7th Cir. 2022) (citing 28 U.S.C. §§ 1332(d)(2), (d)(2)(A), (d)(5)(B)). At the time the case was filed, Plaintiffs alleged the amount in controversy exceeded $5 million, there were hundreds of potential class members, and the class members and Defendants were citizens of different states. (Doc. 34 at ¶¶ 22, 162). Thus, subject matter jurisdiction was satisfied under § 1332(d)(2).

Now that the claims of the putative nationwide class have been dismissed, what remains is an alleged Illinois class made up of "All persons who have paid rent and other fees to Defendants pursuant to a lease agreement with Defendants in the state of Illinois." (Doc. 34 at ¶ 158). Presumably most of those class members are citizens of Illinois, although the Court could envision a scenario where several of those plaintiffs were

citizens of another state but rented a home in Illinois for a brief period of time.

Two of the three Defendants are also citizens of Illinois. Home Partners Holdings LLC is incorporated in Delaware and has its principal place of business in Chicago, Illinois.[3] (Doc. 34 at ¶ 17). Defendant HPA US1 LLC, is also incorporated in Delaware with its principal place of business in Chicago, Illinois. (*Id.* at ¶ 20). Defendant OPVHHJV LLC, which does business as Pathlight Property Management, is incorporated in Texas and has its principal place of business in Texas.

This scenario potentially causes a problem. Under 28 U.S.C. § 1332(d)(4), a "district court shall decline to exercise jurisdiction" when more than two-thirds of class members are from the state in which the lawsuit is filed and at least one defendant "from whom significant relief is sought" is a citizen of that state. *Johnson v. Diakon Logistics, Inc.*, 44 F.4th 1048, 1051 (7th Cir. 2022), *reh'g denied*, No. 21-2886, 2022 WL 4290757 (7th Cir. Sept. 16, 2022); *see also Mullen v. GLV, Inc.*, 37 F.4th 1326, 1328 (7th Cir. 2022) ("[A]district court shall decline to exercise jurisdiction when more than two-thirds of the proposed class members are citizens of the State in which the action was originally filed and other conditions are met."). Here, we have an Illinois class in which most members are Illinois citizens and two Illinois Defendants from whom Plaintiffs seek significant relief.

The Seventh Circuit has classified § 1332(d)(4) as an abstention doctrine that may be raised by the Court *sua sponte*, rather than a limitation on subject matter jurisdiction.

---

[3] Normally, the Court considers an LLC's citizenship to be the citizenship of its members for purposes of diversity jurisdiction. *Copeland v. Penske Logistics, LLC*, 675 F.3d 1040, 1043 (7th Cir. 2012). Under CAFA, however, "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10).

*Mullen v. GLV, Inc.*, 37 F.4th 1326, 1328 (7th Cir. 2022). The Seventh Circuit has also questioned whether abstention under § 1332(d)(4) depends on the original complaint or on "other circumstances that may change as the case proceeds." *Id.* at 1329; *see also Johnson*, 44 F.4th at 1051 ("Whether abstention under the Class Action Fairness Act should be evaluated based on the original complaint or instead on circumstances that may change as the case proceeds is an open issue in this circuit."). If it is the former, then it would be inappropriate for this Court to dismiss the case pursuant to § 1332(d)(4). If it is the latter, then this Court may decline to exercise jurisdiction over this matter.

Because the parties did not address this issue in their briefs, the Court invites them to do so now. On or before **December 16, 2024**, Plaintiffs shall file a supplemental brief stating their position on § 1332(d)(4) and whether this Court must abstain from exercising jurisdiction over the remaining claims. On or before **January 6, 2025**, Defendants shall respond to Plaintiffs' brief. Neither brief shall exceed **10 pages**.

## CONCLUSION

For these reasons, the Court **GRANTS in part** the Motion to Dismiss the Second Amended Complaint filed by Defendants. (Doc. 36). Plaintiffs' claims in Counts I and VIII are **DISMISSED without prejudice**. The Court **RESERVES RULING** on the remainder of Defendants' motion to dismiss.

**IT IS SO ORDERED.**

**DATED:   November 18, 2024**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**